IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| MICHAEL A. SIMONI, ) | CASE NO. 1:16CV338 |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | MAGISTRATE JUDGE |
| ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY ADMINISTRATION, ) | |
| ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. ) | |

Plaintiff Michael Simoni ("Simoni") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB"). Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 13.

For the reasons stated below, the decision of the Commissioner is **AFFIRMED**.

**I. Procedural History**

Simoni protectively filed an application for DIB on July 24, 2012, alleging a disability onset date of November 3, 2010. Tr. 15, 172. He alleged disability based on the following: degenerative disc disease, ruptured discs in back, "need spinal fusion," trouble sitting, squatting and bending, trouble standing and walking for long periods, depression and epilepsy. Tr. 176. After denials by the state agency initially (Tr. 87) and on reconsideration (Tr. 102), Simoni requested an administrative hearing. Tr. 123. A hearing was held before Administrative Law Judge ("ALJ") M.S. Kidd on August 20, 2014. Tr. 42-73. In his December 31, 2014, decision

(Tr. 15-37), the ALJ determined that there were jobs in the national economy that Simoni could perform, i.e., he was not disabled. Tr. 36. Simoni requested review of the ALJ's decision by the Appeals Council (Tr. 10) and, on December 10, 2015, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Simoni was born in 1974 and was 37 years old on the date his application was filed. Tr. 199. He completed high school and had training as an auto mechanic at a vocational school. Tr. 49, 51, 177. He last worked in construction in 2010. Tr. 53-54.

### B. Relevant Medical Evidence[1]

In November 2010, Simoni suffered a low back injury while lifting a heavy piece of asphalt. Tr. 44, 309. On December 21, 2010, he saw his primary care physician, Jack Rutkowski, MD, complaining of low back pain rated as 5-6/10. Tr. 330. Dr. Rutkowski prescribed medications. Tr. 330.[2]

On April 15, 2011, Simoni had an MRI of his lumbar spine based on complaints of back and bilateral leg pain. Tr. 268. The results were "unremarkable" at the L1-L2, L2-L3 and L4-L5 levels and several slight, mild or moderate findings at the L3-L4 level:

> A slight retrolisthesis is present at the L3-4 level with mild narrowing of the disc interspace. There is also moderate desiccation of the disc with mild broad-based posterior

---

[1] Simoni did not challenge the ALJ's findings regarding his mental impairments. Accordingly, only the medical evidence relating to Simoni's challenged physical impairment is summarized and discussed herein.

[2] Dr. Rutkowski's notes are generally illegible. Some information (such as the reason for each visit and the medication list) is discernible but the rest is not. To the extent the parties characterize Dr. Rutkowski's notes as saying one thing or another, the Court reproduces the parties' characterization of Dr. Rutkowski's notes only insofar as the Court can independently determine that the notes state what the parties say they do. In his decision, the ALJ commented on the illegible nature of Dr. Rutkowski's notes, explained that Simoni's attorney stated at the hearing that she had requested a typewritten summary from Dr. Rutkowski detailing Simoni's treatment and an opinion, and advised that the time period within which this evidence was to be presented had long passed and that no evidence had been submitted. Tr. 15, 65-67.

> disc bulge measuring approximately 5 mm. Mild T2 signal is present at the central posterior aspect of the disc indicating edema from an annular tear. There is also mild hypertrophy of the posterior elements and these factors result in a mild canal stenosis. The neural foramina remain patent.

Tr. 268. At the L5-S1 level,

> There is moderate desiccation of the LS-S1 disc with mild narrowing of the disc interspace and a mild retrolisthesis. There is also a moderate broad-based posterior left paramedian disc protrusion that measures up to approximately 6 mm in AP dimension and 1.5 cm at its base. This does impinge and posteriorly deviate the passing left S1 nerve root. There is also mild right foraminal to extraforaminal disc protrusion measuring 4-5 mm, but without discrete LS nerve root impingement at the foramen. The left neural foramen is patent.

Tr. 269.

On May 3, 2011, Simoni saw neurologist John Collis, M.D, complaining of low back and bilateral leg pain. Tr. 272, 276-277. He reported a history of back pain since 1999 when he felt low back pain the day after lifting weights. Tr. 276. After receiving physical therapy and epidural steroid injections he felt good for years. Tr. 276. He reported that, "Overall now his condition is staying the same." Tr. 276. His pain is worse after three to four days of activity wherein he experiences three to four days of pain. Tr. 276. His leg pain comes and goes without reason and he denied numbness or tingling. Tr. 276. He stated that squatting and exercise hurt his back and that he felt better with rest and medication. Tr. 276. His pain was intermittent, sharp, cramping and rated a 4-8/10. Tr. 276. Upon examination, he had a stable gait, normal reflexes, a negative Babinski's sign, 5/5 strength, intact sensation, and intact heel and toe walk. Tr. 276. His hip abduction was mildly reduced on his right side and moderately reduced on his left side. Tr. 276. His lumbar range of motion on flexion was normal, his lumbar extension was moderately reduced, his lateral rotation and bending was normal (albeit with pain upon right

3

lateral bending), and he had a slight positive straight leg raise test on his right leg ("85° with tightness").[3] Tr. 276.

Following this examination, Dr. Collis wrote a letter to Dr. Rutkowski, advising that Simoni's "left leg and low back pains are probably coming from the left L5 herniated disc" and that "[h]is anterior right thigh pain probably does not come from his spine." Tr. 272. He recommended an EMG test and bloodwork and stated that Simoni was to follow-up when the testing had been completed. Tr. 272.

On May 12, 2011, Simoni underwent EMG testing. Tr. 273-275. Upon exam, he had a negative straight-leg raise testing, his flexibility was preserved, his strength and reflexes were intact, and he had discomfort upon bilateral palpation of his paravertebral muscles. Tr. 273. The EMG study was interpreted by A.S. Chauhan, D.O., as "left L5 and/or S1 lumbar nerve root inflammation without significant axon loss, consistent with lumbar radiculopathy, mild" and "minimal right L5/S1 nerve root inflammation also noted." Tr. 275.

On May 19, 2011, Simoni returned to Dr. Collis. Tr. 278. This visit does not appear in the record, but Dr. Collis wrote another letter to Dr. Rutkowski describing his conclusions. Tr. 278. Dr. Collis noted the presence of an abnormal rheumatoid factor but a normal sedimentation rate and suggested Simoni consultant with a rheumatologist. Tr. 278. He characterized the MRI results as follows:

> His MRI has been thoroughly studied. His bottom disc, L5, is degenerated but it also has two herniations. One is classical on the left side with the posterior lateral bulge that touches the left S1 nerve root. On the other hand, the right sided herniation is far lateral, and into the foramen! [sic]. This is most unusual. However it does explain the intense pain in the distribution of his right-hip lateral thigh area.

---

[3] In a straight leg-raising test, the patient lies down supine, fully extends the knee, and lifts the leg. *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 1900. Leg pain when the leg is raised 30-90 degrees (a positive straight leg raise) indicates lumbar radiculopathy. *Id*.

Tr. 278. Dr. Collis planned to discuss the possibility of surgical treatment following the rheumatology consultation:

> In summary, I would like for Michael to have a rheumatology evaluation. I would then like to discuss surgery with Michael and unfortunately it will not be the routine type. He will need to have the two bulges removed, but since that disc is so "arthritic", and he needs the discectomies performed at the same level, I want to consider his also having a fusion of the L5 vertebrae with the sacrum.

Tr. 278.

In June 2011, Simoni saw rheumatologist Kimberly K. Thomsen, MD. Tr. 281-282. He detailed his history of lower back injury that had gotten worse recently, with discomfort felt in the later part of the day and also when he engages in activity. Tr. 281. He denied chronic morning stiffness, any other joint stiffness or swelling, and pain in his ankles or feet. Tr. 281. He reported taking an anti-inflammatory regularly for "years" and stated that when he does not take this medication he "feels like an old man": he is stiff in his back, hands and feet. Tr. 281. The day of the exam his pain was 0/10. Tr. 282. He described that his pain had recently improved slightly with the use of an inversion table. Tr. 282. Upon exam, he showed no active synovitis of his bilateral upper or lower extremities, had a good range of motion throughout, and appropriate strength throughout. Tr. 282. Dr. Thomsen concluded that, based on her exam, Simoni was not showing signs consistent with an active inflammatory arthritis such as rheumatoid arthritis or a spondylitis but that his positive rheumatoid factor warranted further workup. Tr. 282. She commented that his positive rheumatoid factor could be either a false positive, a mild case of rheumatoid arthritis masked by his use of anti-inflammatories, or a true positive as "sometimes the rheumatoid factor can be positive years before the actual onset of physical symptoms." Tr. 282. She ordered a hepatitis panel, an anti-CCP antibody test, and X-

rays of his hands and feet, explaining that if anti-inflammatory use has been masking inflammatory arthritis, x-rays should reveal chronic changes. Tr. 282.

On March 12, 2012, Simoni saw chiropractor Dr. Abood. Tr. 285. Simoni complained of sharp, constant and aching lumbar pain, rated 8/10. Tr. 285. Upon examination, he had edema, fixation, and muscle spasm in his lower lumbar spine. Tr. 285. Dr. Abood recommended "a series of 20 sessions of non-surgical lumbar decompression." Tr. 285. After three straight days of treatment, Simoni stated that his pain had improved to 5/10. Tr. 285. After a five more treatments he rated it as 3/10, and the last four visits, from April 17 to May 2, Simoni stated that his pain level had been 2/10 during that 15-day period. Tr. 288-289. On his last visit on May 2, he still had interspinous hypertoncity in his lumbar spinal muscles, edema and muscle spasm. Tr. 289. He had a decrease in swelling and spasms in his bilateral paralumbar muscles and bilateral gluteal muscles. Tr. 289. Dr. Abood noted that Simoni had responded well and was improved, including his mobility. Tr. 289.

On July 2, 2012, Simoni reported to Dr. Rutkowski that his low back pain level was 6-7/10. Tr. 322. On November 28, 2012, Simoni again reported pain of 6-7/10. Tr. 320.[4]

**C. Medical Opinion Evidence**

    **1. Consultative examiners**

---

[4] The form upon which Dr. Rutkowski recorded his observations indicate that abnormal findings would be commented on, while other findings would be circled. *See, e.g.*, Tr. 321 ("** Circle (-)(+) findings. Comment abnormal findings. NA = not assessed. **"). Dr. Rutkowski's scribbling is so chaotic that it is difficult, if not impossible, to assess which items he circled on each form and, moreover, what he meant by circling them. He did consistently circle items indicating that Simoni appeared well and was in no apparent distress. *See, e.g.*, Tr. 321, 376. He also regularly circled items related to Simoni's back. However, when it can be determined that Dr. Rutkowski circled one item, such as straight leg raise testing (SLR), it is not clear whether he circled the choice "(-) SLR" because Simoni had a negative, normal SLR or a positive, abnormal SLR. In at least one treatment note Dr. Rutkowski added a large "+" sign over the "(-) SLR" choice (Tr. 371), seemingly indicating a positive SLR and further indicating that when he circled "(-) SLR" he meant that Simoni had a normal, negative SLR.

On September 29, 2012, Simoni saw Christina Feser, DO, for a consultative examination. Tr. 309-313. Simoni reported a history of back problems since 2010 "secondary to herniated discs." Tr. 309. Following his more recent injury from lifting asphalt, he was treated with medications and spinal decompressions. Tr. 309. His pain was sharp, achy and shooting and radiated into his right leg. Tr. 309. Prolonged or strenuous activity exacerbated his symptoms and changing position and medication improved them. Tr. 309. He reported pain on a scale of 6-7/10 most days and, on examination day, a 5/10. Tr. 309. He stated that his pain was the reason he could not work in addition to difficulty he had sitting, standing, walking, bending and lifting. Tr. 309. He listed his prescribed medications: Tegretol (for seizures), Remeron and Flexeril. Tr. 309. He stated that his daily activities included doing things around the house. Tr. 310. He reported that he could sit for ten to twenty-five minutes, stand for twenty to twenty-five minutes, walk short distances and lift and carry minimal weight occasionally. Tr. 310. Upon exam, he had normal reflexes, sensation, and negative straight leg raise testing. Tr. 310. He had tenderness in his lumbosacral spine but a normal gait, could walk on heels and toes, could hop on either foot, could rise from a squatting position "with ease" and from a sitting position without assistance, and had no difficulty getting up and down from the exam table. Tr. 312. He had full muscle strength, no evidence of muscle spasm, atrophy or clonus, and he had a full range of motion. Tr. 313. Dr. Feser opined that Simoni could sit, stand and walk normally in an eight-hour day with normal breaks. Tr. 313. Due to his back pain, he had mild limitations lifting and carrying and could occasionally bend, stoop, crouch, crawl, squat "and so on." Tr. 313. He did not need an assistive device for short or long distances or uneven terrain. Tr. 313.

After the hearing, the ALJ "decided that, in the claimant's favor," he would arrange a second consultative exam.  Tr. 15.[5]  On October 25, 2014, Simoni saw Dariush Saghafi, M.D., for a consultative examination.  Tr. 378-380.  Simoni reported his history and stated that he was unable to do yard work or physical labor.  Tr. 378.  His lower back pain "never goes away."  Tr. 368.  Upon exam, he had full motor strength, intact sensation, no percussion tenderness over his spinal area, brisk and symmetric reflexes, a normal gait with normal arm swing and no predisposition to falls and negative special signs.  Tr. 379-380.  Dr. Saghafi opined that Simoni suffers from chronic low back pain with occasional radicular radiations of pains into his legs suggestive of either a lumbar canal stenosis or nerve root impingement.  Tr. 380.  He is able to lift, push, and pull sufficiently to be able to perform activities of daily living and is able to bend, walk, and stand "x 20-25 minutes[.]"  Tr. 380.

### 2. State Agency Reviewers

On October 16, 2012, state agency reviewing physician Leigh Thomas, M.D., reviewed Simoni's record.  Tr. 81-84.  Regarding Simoni's residual functional capacity ("RFC"), Dr. Thomas opined that Simoni could lift 20 pounds occasionally and 10 pounds frequently, sit for six hours a day, stand/walk for six hours a day, could not climb ladders, ropes or scaffolds and was limited to occasional crouching, stooping, and crawling.  Tr. 83.  Due to his history of seizures, Simoni needed to avoid all exposure to hazards such as unprotected heights and dangerous moving machinery.  Tr. 84.

On February 8, 2013, state agency reviewing physician Gerald Klyop, M.D., reviewed Simoni's record and adopted Dr. Thomas' opinion.  Tr. 97-99.

### D. Testimonial Evidence

---

[5] The ALJ permitted Simoni's counsel to provide written comments, arguments, additional records, and/or request a supplemental hearing in response to the new examiner's report.  Tr. 16.  Counsel filed a response to the examiner's report, including new legal arguments, which the ALJ considered.  Tr. 16.

### 1. Simoni's Testimony

Simoni was represented by counsel and testified at the administrative hearing.  Tr. 46-67, 71-73.  He lives with his wife and sister-in-law in a condominium with multiple levels of steps.  Tr. 48.

His past work was heavy construction work.  Tr. 52.  He dug ditches, poured and shoveled concrete, and ran a jackhammer.  Tr. 52.  He was laid off from his last job, in 2010, and has not worked since then; after he was laid off, he injured his back lifting a piece of asphalt in a church parking lot during a "one-day charity job."  Tr. 53-54.

Simoni described the location of his pain as where his lower back meets his rear end on the left side.  Tr. 54.  His muscles in the area around his kidneys get tight—"lock up"—and cause pain.  Tr. 54.  The pain also occasionally radiates down his left leg as far as his thigh.  Tr. 55.  His pain is worse when he is driving or standing at the kitchen counter cutting food.  Tr. 55.  He goes grocery shopping but does not go alone because of the heavy lifting and driving involved.  Tr. 50.  The driving causes pain in his middle and lower back.  Tr. 50.  He will drive if it is snowing outside and his wife is not comfortable driving.  Tr. 50.

Simoni stated that he had to stop doing yard work after his injury in 2010; he tried doing some yard work in 2011 but has not done any yard work the current year or previous year.  Tr. 55-56.  He helps with cooking "a little bit, like I cook something fast, like 20 minutes or so," two days a week.  Tr. 56.  He also sometimes cleans things like the tops of dressers.  Tr. 56.  His wife does the laundry but sometimes he will put the load in.  Tr. 57.  She will take the load out "and ha[n]d it to me, because I can't bend."  Tr. 57.  He can carry a load of clothes but "usually skip[]s the basket because it reduces the weight."  Tr. 63.  If he drops something on the floor he goes down on one knee to get the item off the floor.  Tr. 57.  He can carry some groceries into

9

his home, one bag in each hand, but these are usually light items like chips and bread.  Tr. 64.  He does not use a cane or a brace or any kind of assistive device.  Tr. 51.  He has not had any falls.  Tr. 67.

Simoni testified that, for the last two years, he has only seen Dr. Rutkowski.  Tr. 57.  The ALJ confirmed that he had previously seen Dr. Collis in 2011, that Dr. Collis's notes mentioned possible surgery, and that Simoni did not appear to follow-up.  Tr. 57.  When asked why, Simoni responded that he chose to try spinal decompression with a chiropractor instead.  Tr. 57, 58.  He explained that he did not feel good about the fusion surgery that Dr. Collis mentioned and that, when he asked Dr. Rutkowski about it, Dr. Rutkowski "kind of told me because it's so physical—you know, he didn't really—couldn't say whether it would work out or not."  Tr. 58.  Simoni also stated that he asked his union representative and the union rep informed Simoni that "guys that get the fusion don't make it when they come back."  Tr. 58, 60.  Simoni explained that because of these conversations he did not think that the fusion surgery "would bring me back, especially to that."  Tr. 58.

The ALJ asked what would be the problem with Simoni performing work that was not a job that required heavy lifting, such as a job standing or sitting.  Tr. 58.  Simoni answered that he has problems in the middle of his back also, and that he can only stand for about 20-25 minutes.  Tr. 58.  He can walk for 15 minutes and sit for 20-25 minutes.  Tr. 59.  After he sits he gets up and paces, "tr[ies] to walk it off.  Sometimes I lay down."  Tr. 60.  He does not have problems showering, dressing or bathing.  Tr. 59.  When he shaves, he leans one arm on the wall.  Tr. 59.  He has slept on the floor since 1999 because it is the most comfortable for his back.  Tr. 61.  Despite taking his medications, he sleeps badly due to pain about twice a week; on those nights he gets only about five hours of uninterrupted sleep in one night.  Tr. 62-63.  The most

comfortable position for him is reclining in a chair with his feet up.  Tr. 62.  He spends about three hours a day in a reclined position, but not all at once.  Tr. 62.

Simoni stated that he tried "inversion table therapy" which helped "a little bit" and spinal decompression with his chiropractor Dr. Abood but that did not help at all: "nothing."  Tr. 64-65.  Now he only sees Dr. Rutkowski once a month.  Tr. 65.  He has not followed up about the possibility that he has rheumatoid arthritis.  Tr. 67.

Simoni testified that he thinks that he could lift six or seven pounds on a continuous basis.  Tr. 65.  He could not sit, stand or walk for six hours in an eight-hour workday because of pain.  Tr. 65.

### 2. Vocational Expert's Testimony

 Vocational Expert Dr. Robert Mosley ("VE") testified at the hearing.  Tr. 67-71.  The ALJ testified that Simoni's past relevant work is defined as a construction worker.  Tr. 68.  The ALJ asked the VE to determine whether a hypothetical individual of Simoni's age, education and work experience could perform  work if the individual had the following characteristics: can perform sedentary work and never climb ladders, ropes or scaffolds; can occasionally stoop, crouch and crawl; and should avoid all exposure to hazards such as unprotected heights and dangerous machinery.  Tr. 68.  The VE answered that such an individual could perform the following jobs: bench assembly type jobs such as final assembler (100,000 national jobs, 6,000 Ohio jobs, 1,800 regional jobs); lens inserter (100,000 national jobs, 6,000 Ohio jobs, 1,100 regional jobs); and table worker (100,000 national jobs, 6,000 Ohio jobs, 1,500 regional jobs).  Tr. 69.

The ALJ asked if such an individual could still perform those jobs if that person had the following additional limitations: can perform unskilled work in a static environment, would

experience infrequent changes and the changes that did occur would be explained and/or demonstrated, and there would be no strict time or high production quotas. Tr. 69. The VE answered that such an individual could perform the jobs previously identified. Tr. 69. The ALJ asked if such an individual could perform the same jobs if the individual would need to alternate between a sitting and standing position every 30 minutes. Tr. 69. The VE answered that such an individual could still perform the jobs previously identified and that his answer would remain the same if the individual need to alternate at-will. Tr. 70. The ALJ asked what the generally accepted rate for an individual being off-task was and the VE replied that, in his opinion, an individual off task up to 15% of the time or more would have difficulty retaining a job. Tr. 70.

Simoni's attorney asked the VE whether the last hypothetical individual described by the ALJ could perform the jobs previously identified if the individual would have to stand and walk approximately every 10 minutes every hour, leaving the work station while doing so. Tr. 70-71. The VE answered that such an individual would not be able to maintain and retain the jobs previously identified or other jobs in the local or national economy. Tr. 71. Simoni's attorney asked the VE if his answer would change if, instead of the limitation just described, the hypothetical individual would have to take a break every hour to recline or lie down for at least 10-15 minutes. Tr. 71. The VE stated that such an individual would not be able to perform any jobs. Tr. 71.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[6] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

---

[6] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20

13

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In his December 31, 2014, decision, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.  Tr. 18.

2. The claimant has not engaged in substantial gainful activity since November 3, 2010, the alleged onset date.  Tr. 18.

3. The claimant has the following severe impairments: degenerative disc disease ("DDD") of the lumbar spine with two herniated discs, obesity, a history of learning disability, and attention-deficit disorder ("ADD").  Tr. 18.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 20.

5. The claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except that h[e] is further limited as follows: must be allowed to alternate from seated to standing positions at will but will remain present and on task at the workstation; can never climb ladders, ropes, or scaffolds and can no more than occasionally stoop, crouch, or crawl; must avoid all exposure in the work environment to hazards of unprotected heights and dangerous machinery; can perform unskilled work tasks in a static environment that would experience infrequent changes and those changes that did occur would be explained and/or demonstrated to him; and cannot perform tasks with strict time or high production quotas.  Tr. 25.

6. The claimant is unable to perform any past relevant work.  Tr. 35.

7. The claimant was born on May 14, 1974 and was 36 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date.  Tr. 36.

---

C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

8. The claimant has at least a high school education and is able to communicate in English. Tr. 36.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills. Tr. 36.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform. Tr. 36.

11. The claimant has not been under a disability, as defined in the Social Security Act, from November 6, 2010, through the date of this decision. Tr. 37.

## V. Parties' Arguments

Simoni objects to the ALJ's decision on one ground: that the ALJ erred in his Step Five determination because he did not properly consider Simoni's disabling pain. Doc. 17, pp. 6-11. In response, the Commissioner submits that the ALJ properly considered Simoni's complaints of pain and his decision is supported by substantial evidence. Doc. 20, pp. 6-10.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health and Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor

resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

20 C.F.R. § 416.929(c) sets forth the standard for evaluating pain and the extent to which pain can reasonably be accepted as consistent with the objective medical evidence and other evidence.  When evaluating the intensity and persistence of pain, the ALJ considers all available evidence, including objective medical evidence obtained from clinical and laboratory diagnostic techniques (i.e., range of motion, sensory deficit); the claimant's daily activities; the location, duration, frequency, and intensity of pain; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any medications taken; treatment, other than medication, received; and any measures used to relieve pain.  *Id.*

Simoni argues that the ALJ erred at Step Five because he did not properly consider Simoni's complaints of pain when assessing an RFC that found him capable of performing sedentary work with an at-will sit/stand option and postural and environmental hazard limitations.  Tr. 25.

The ALJ properly considered Simoni's complaints of pain.  In an inordinately detailed and thorough opinion, the ALJ discussed Simoni's history and explained,

> The results of [Simoni's] MRI scans and an EMG/nerve conduction study do support that the claimant has significant disc pathology at L5-S1 of the lumbar spine, with the proportionate results of those studies generally consistent with his testimony about having constant, albeit not at all times of the same intensity, pain in his lower back region and having less frequent pains in his legs.  Thus, the results of diagnostic laboratory testing provides strong objective medical support for some significant limitations in physical work-related abilities, both exertionally in terms of lifting and carrying objects and in sitting, standing, and walking for extended periods as well as in some nonexertional capacities.
>
> However, the objective clinical findings on physical examinations done since the date of the injury are simply too unremarkable, and fairly consistently so across the albeit limited examinations done between 2011 and 2014, to support the claimant's main allegation that

16

> he would not even be able to perform a reduced range of sedentary work on a sustained, full-time (eight-hour day, five-day per week) basis.

Tr. 27-28.  The ALJ spent the following two pages of his decision detailing Simoni's visits with medical providers Drs. Collis, Thomsen and Rutkowski; both consultative examiners (Drs. Feser and Saghafi); and chiropractor Dr. Abood, and discussed Simoni's mostly normal clinical examination findings throughout the entire period in the record.  Tr. 28-29.  He concluded,

> The medical evidence through objective clinical findings thus substantially tempers the findings from diagnostic tests in a critical respect of how pain limits the claimant's physical functional abilities.  Accordingly, I am unable to find the medical evidence as a whole generally proportionate with the claimant's main allegation that pain is so intense, persistent despite treatment, and limiting that he would be unable to perform a range of sedentary work activity that would not have him climbing at heights or being exposed to hazards and that would have him no more than occasionally performing postural positionings of stooping (bending forward at the waist), crouching and crawling.

Tr. 29.  Later in his decision, the ALJ spent three pages exhaustively discussing his assessment of Simoni's credibility.  Tr. 31-33.

Simoni asserts that the ALJ erred because "[t]he record is replete with evidence of Plaintiff's history of back pain.  MRI and EMG results provide an objective basis for a medically determinable impairment that clearly supports the severity of the pain the plaintiff has alleged."  Doc. 17, p. 10.  As explained above, the ALJ considered Simoni's history of back pain and test results and explained why these facts did *not* support the severity of his pain.  That his test results allegedly "are generally considered to be quite severe and expected to produce debilitating symptoms," as Simoni alleges, does not mean that Simoni's condition actually produced a certain level of debilitating symptoms in him.  The ALJ discussed his findings such as the fact that Simoni received conservative treatment and that "he remains in sole treatment for his back pain through medications routinely prescribed by his family physician."  Tr. 32.  Notably, the ALJ did not find that Simoni met or medically equaled Listing 1.04 (Disorders of

the Spine), a finding that would have rendered him disabled at Step Three.  Tr. 21-23.  Simoni does not challenge that portion of the ALJ's decision.

Next, Simoni states that Dr. Collis "endorses these [sic] results and concludes that Plaintiff's alleged symptoms of radicular pain are a result of this [sic] medically determinable impairment."  Doc. 17, p. 10.  It is not clear what "results" Simoni is referring to.  Regardless, that Dr. Collis "endorsed" any of the undisputed findings described above (that the ALJ himself credited and thereby "endorsed") does not mean that the ALJ erred is assessing Simoni's pain.  There is no dispute that Simoni has a medically determinable impairment and associated pain.  Tr. 18 (ALJ finding that Simoni's lumbar spine disorder was a medically determinable impairment); Tr. 27 (ALJ explaining that Simoni's lumbar spine disorder caused his back and leg pain).  Simoni's contention that Dr. Collis characterized Simoni's "impairment" as "complicated" based on the degree of arthritic change in Simoni's spine (Doc. 17, p. 10, citing Tr. 278) is a factual assertion and does not identify any error by the ALJ.  And it is incorrect; Dr. Collis described Simoni's lumbar MRI results as "most unusual," which the ALJ acknowledged.  Tr. 278 (Dr. Collis's letter); Tr. 27 (ALJ's decision detailing Dr. Collis's interpretations of Simoni's MRI results, including Dr. Collis's opinion that the results were "most unusual").  Finally, the ALJ considered treatment records from Dr. Collis, including Simoni's primarily normal physical exams.  Tr. 22, 27, 28, 32.  Notably, the ALJ found Simoni to be more limited than the opinion sources, the latter sources having found Simoni capable of performing light work.  Tr. 33-34.

Simoni identifies other evidence in the record that he argues supports his complaints of pain, such as records noting that Simoni alleged pain throughout the pertinent period as 6-7/10 and his testimony that he needs to lie down regularly throughout the day to relieve his pain.  Doc.

17, pp. 10-11. The ALJ discussed Simoni's alleged pain on 1-10 pain scales that appeared throughout the record and, indeed, found him partially credible due to the general consistency in his reporting these complaints to his physicians (Tr. 33). *See also* Tr. 29, 31-32. The ALJ also acknowledged Simoni's allegation that he would need to lie down regularly during a workday. Tr. 33. Thus, Simoni does not describe an error by the ALJ but, instead, merely seeks to have this Court reweigh the evidence, which this Court cannot do. *Garner*, 745 F.2d at 387 (A court "may not try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility."); *Huan v. Comm'r of Soc. Sec.*, 107 Fed.App'x 462, 465 (6th Cir. 2004) ("We may not reweigh conflicting evidence on appeal, but instead must affirm" the ALJ's decision when supported by substantial evidence). The ALJ's decision is supported by substantial evidence and Simoni's assertion that the evidence in the record should have been weighed even more heavily in his favor is not grounds for reversing the ALJ's decision. *Id*.

## VII. Conclusion

For the reasons stated above, the decision of the Commissioner is **AFFIRMED**.

Dated: December 6, 2016

_Kathleen B. Burke_
Kathleen B. Burke
United States Magistrate Judge